FILED

2013 Dec-11  AM 11:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **PHYLLIS D. ROBINSON,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:11-cv-4141-JHH** |
| **ROCKTENN CP, LLC, formerly known as SMURFIT-STONE CONTAINER CORPORATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OPINION

The court has before it the July 1, 2013 Motion (Doc. # 34) of Defendant RockTenn CP, LLC for Summary Judgment.  Pursuant to the court's July 3, 2013, and July 12, 2013 orders (Docs. # 38 & 40), the Motion was deemed submitted, without oral argument, on August 30, 2013.  After careful review of the briefs and admissible evidence, the court concludes that the Motion (Doc. #34) for Summary Judgment is due to be granted in part and denied in part for the following reasons.

## I. Procedural History

Plaintiff Phyllis D. Robinson commenced this action on December 8, 2011 by

filing a Complaint[1] in this court alleging gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. ("Title VII"), disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112, et seq. ("ADA"), as well as retaliation for reporting and opposing employment discrimination in violation of both Title VII and the ADA. (Doc. # 16.) Defendant's Motion (Doc. #34) for Summary Judgment asserts that all of Plaintiff's claims fail as a matter of law.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted evidence[2] (Doc. # 37) in support of its own motion for summary judgment and filed a supporting brief (Doc. #35) and statement of facts (Doc. # 36) on July 1, 2013. On August 16, 2013, Plaintiff filed a brief (Doc.

---

[1] Plaintiff amended her complaint on March 7, 2012, to clarify that she did not seek any recovery for acts before 180 days from her EEOC charge, which was filed on October 25, 2010. (Doc. #16.)

[2] Defendant submitted the following evidence: Amended Complaint; Doc. #15; Plaintiff's Deposition; EEOC Intake Questionnaire; Discipline, Counseling & Corrective Action given to Plaintiff; Collective Bargaining Agreement; James O. Howard Deposition; Return to Work authorization; Fit for Duty Exam note; 6/14/10 counseling record; 7/16/10 disciplinary notice for Plaintiff; 7/16/10 disciplinary notice for Morris Gunn; 7/20/10 disciplinary notice for Plaintiff; 7/20/10 disciplinary notices for Morris Gunn and Oscar Smith; 8/26/10 disciplinary notice for Plaintiff; 10/14/10 disciplinary notice for Plaintiff; Defendant's response for first set of interrogatories; 6/20/05 Last Chance Agreement; 3/30/09 Last Chance Agreement; 10/25/10 EEOC Charge; 10/15/09 EEOC Charge; 9/7/10 EEOC Dismissal Notice; Plaintiff's filed employment complaints; 1/1/05-12/31/11 terminated employees report.

# 41) and evidence[3] (Doc. # 42) in opposition to Defendant's motion for summary judgment.   On August 30, 2013, Defendant filed a brief (Doc. #44) in reply to plaintiff's opposition, and the Motion (Doc. #34) was deemed submitted, without oral argument.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by

---

[3]  Plaintiff submitted the following evidence: Plaintiff's Amended interrogatory responses; Declaration of Plaintiff; 6/4/99 medical form; 9/21/09 request for accommodation; 9/30/09 emails between Murray and Howard; 11/5/09 request for accommodation; 11/09 request for accommodation from Robert S. Wolf, M.D.; 2010 disciplines of Plaintiff; Dallas Amos discipline history; Otis Evans discipline history; Bobby Chapman's discipline history; Bobby Chapman's Last Chance Agreement; 12/30/10 email subject: Derrick Gonzales; Charles Timothy Taylor's EEOC Charge; Notice of Charge of Discrimination and EEOC Charge; Plaintiff's 2005 employment issues.

its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes

4

such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional

5

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Plaintiff began working for Defendant in July 1997 at its plant in Birmingham, Alabama, as a utility employee.  (Amend. Compl. ¶ 9.)  During her employment with Defendant, her job title became that of an Assistant Operator and remained as such throughout all times relevant to this case.  (Robinson Dep. at 24-25; see also EEOC Intake Questionnaire.)    Orlando "James" Howard was the plant manager for the Birmingham plant during the relevant time period.  (Howard Dep. at 15-16.)  As the plant manager, Howard directly supervised the plant superintendent, Ron Murray, who in turn was in charge of the supervisors.  (Id. at 17.)  Howard had overall responsibility over the supervisors, and supervised them directly on a day-to-day basis.[5]  (Id. at 16-18.)

---

[4]If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

[5]  All supervisor positions were held by males during the time relevant to this action. (Howard Dep. at 127-28.)

The Birmingham facility was unionized, and under the Collective Bargaining Agreement (CBA), employees bid on what shift, machine and job they wanted to work. (Robinson Decl. ¶ 4; Howard Dep. at 56.) The bidding process was controlled by seniority under the CBA. (Robinson Decl. ¶ 4.)

## A.  The 120 Machine

Robinson worked on the 120 machine at all relevant times. There was one operator and two or three assistant operators who worked on the 120 machine. (Robinson Dep. at 25, 29.) Each assistant operator was assigned to a different area or part of the 120 machine. (Id.; Howard Dep. at 56.) Robinson testified that assistant operators did not rotate positions or areas on the 120 machine, but that each person worked their assigned area. (Robinson Dep. at 25, 29.) The only times, according to Robinson, when an assistant operator would work a different part of the machine than his or her assigned area was during break periods, if someone was absent, or if the employees themselves agreed to swap jobs. (Id.)

The 120 machine was the only manual machine at the Birmingham plant. Robinson testified that she was assigned to the prefeeder position on the 120 machine. (Robinson Decl. ¶ 8; Robinson Dep. at 16.) The prefeeder on the 120 machine was automatic and did not require manual labor, as opposed to the stacker position which required bending and lifting. (Robinson Dep. at 24-25; Robinson

7

Decl. ¶¶ 9-10.)  Robinson had the highest seniority on the 120 machine, which is how she got to work the prefeeder position.  (See Pl. Exh. 1 at 16.)

## B.  Progressive Discipline Policy

Defendant had two progressive discipline processes.  The first was related to attendance.  It was based on a points system where the level of discipline issued (i.e., verbal warning, written warning, in-house suspension, termination) was dependant solely on the number of points an employee had on his or her record for attendance infractions.  (Howard Dep. at 23-24.)  If an employee went for 30 days without an attendance-related discipline, his or her oldest attendance-related infraction (and the points associated with it) would be erased.  (Id. at 24-25.)  Any employees level in the attendance discipline process did not have any bearing or his or her progression through the other discipline process - that for plant rule violations - and visa versa. (Id. at 28, 130, 156.)

The second progressive discipline process was for plant rule violations.  (Id. at 50-51.)  This discipline process was not run on a point system, like the attendance-related discipline process.  (Id. at 29.)  Instead, under the progressive discipline process for plant violations, there were different levels of discipline: a verbal warning, a written warning, suspension or in-house suspension, and finally termination.  (Id. at 29, 45.)  In addition, supervisors, the superintendent and the plant

8

manager, at their discretion, could decide to issue a counseling instead of a formal discipline for a plant rule violation.  (Id. at 37-38.)  A counseling could be issued in lieu of any level of discipline in the overall discipline process, including termination, for violation of plant rules.  (Id.)  Counselings, verbal warnings, written warnings and suspensions were issued by the supervisors, but final warnings and terminations are issued by the plant manager and human resources.  (Id. at 33-34.)

With regard to plant rule discipline, an employee was allowed to have one of each level of discipline action in his or her file at a time.  (Id. at 46-48.)  Plant rule violations remained active for one year from the date of the violation.  (Id. at 37, 50-51.)  As such, if an employee received a verbal warning for a plant rule violation, and within the next year violated another plant rule, the employee should receive the next level of discipline, a written warning, next.  (Id.)  Receipt of a counseling, however, did not affect the employee's level in the discipline process.  (Id. at 34-35, 38.)

## C.  Robinson's Discipline History

Throughout Robinson's employment with Defendant, she was disciplined numerous times for work performance issues.[6]  Prior to her discharge at issue here,

---

[6]  Before the time frame relevant here Robinson was disciplined as follows: Discipline, Counseling, and Corrective Action Given to Plaintiff; oral warning on March 1, 2000; counseling on March 27, 2003; verbal warning on April 14, 2003; written warning on June 5, 2003; counseling on June 6, 2003; counseling on June 14, 2003; verbal warning on June 18, 2003; counseling on April 27, 2004; verbal warning on March 3, 2005; a written warning on March 10, 2005; suspension on March 17, 2005; suspension on March 22, 2005 and termination on March

Robinson had been discharged two other times as part of the progressive discipline process for violation of plant rules. (Def. Exh. 5.)   On two occasions, Defendant discharged Robinson and then allowed her to return to work after negotiating a last chance agreement. (Def. Exh. 18.) In addition to the two times she was discharged and allowed to return to work, there was one occasion, when Robinson was at the progressive disciplinary step for discharge, and Defendant issued Robinson another last chance agreement instead of terminating her. (Def. Exh. 19.)

## D. Robinson's Knee Surgery and Return to Work

Robinson struggled with knee problems throughout most of her employment with Defendant.   Robinson had her first knee operation on June 28, 1999 to repair a tear of her meniscus. (Pl. Exh. 3.) Her physician noted that it was undetermined whether Robinson would require additional treatment for her knee condition after her surgery. (Id.)

Ten years later, Robinson had a full knee replacement surgery in December 2009 and was on short-term disability leave until June 2010. (Pl. Exh. 1 at 15.) After

---

23, 2005; last chance agreement on June 20, 2005; suspension on June 22, 2005, termination on June 27, 2005; return to work arrangement on July 1, 2005; counseling on December 2, 2005; counseling on November 29, 2007; verbal warning on May 19, 2008; written warning on May 20, 2008; suspension on July 14, 2008; verbal warning on September 3, 2008; counseling on March 17, 2009; suspension on March 24, 2009; last chance agreement on March 31, 2009; written warning on October 27, 2009. Exh. 5.)

her surgery, Robinson remained limited in her ability to walk, bend and lift, and she walked with a noticeable limp.  (Robinson Decl. ¶ 7.)  She wore a knee brace and support stockings for assistance in walking, bending and standing.  (Id.)

Robinson returned to work in early June of 2010 with an authorization from her doctor stating that she was able to work without any restrictions.  (Def. Exh. 8.)  Howard requested that Robinson also see the Defendant's doctor to confirm that she was able to work.  (Robinson Dep. at 13-23.)    The company doctor examined Robinson and gave her a fit-for-duty exam note, stating that she could perform the essential functions of her job and did not need any accommodations.  (Def. Exh. 9.)

With those two clearances, Robinson returned to her position as an Assistant Operator on the 120 machine on June 8, 2010.  (See id.)   Robinson testified that Howard was not pleased with her return to work.  (Robinson Dep. at 15.)  She testified that Howard stated to Ron Murray in a meeting with supervisors and management that "she is not going to be able to work like that."  (Id.)

Robinson testified that from the first day of her return, her supervisors began removing her from her prefeeder position and putting her on the tougher, manual stacker position.  Robinson contends that two to four times a week, her supervisors Donnie Young and Richard Spencer would remove her from the prefeeder position and replace her with a male employee who had less seniority.  (Id. at 33, 98-99.)

11

Robinson asserts that she was forced to work the stacker position on the 120 machine which required extensive lifting and manual labor.  (Id.; Pl. Exh. 1 at 9.)  She also contends that after she returned to work, Robinson was taken off her part of the set-up and replaced her with a male assistant operator, which again forced her to work the more difficult, labor-intensive set-up tasks.  (Id. at 10.)

**E.  Robinson's Discipline Problems After Her Return to Work**

Robinson's discipline problems continued when she returned to work after her knee replacement surgery.  Robinson denies that these events occurred and/or had a different version of what happened.  To accurately reflect the record on each event, the court details first what the discipline record states, and then provides Robinson's testimony regarding each incident.

- On June 14, 2010, Robinson was given a counseling record because a supervisor, Donnie Young, observed Robinson sitting on an ink bucket instead of participating with the rest of the crew to set-up a machine for an order. (Def. Exh. 10.)

  Robinson testified that Young asked her to put a large and heavy cutting dye on the 120 machine, but due to her knee problems, she was unable to lift it up and put it over the cylinder, and she told Young she could not do it. (Robinson Dep. at 62-63.) Robinson asked Oscar Smith to put the cutting dye over the cylinder for her, and he did.  (Id.)  Robinson testified that she helped Smith, and completed the task by mounting it on the machine.  (Id. at 63.)  She further testified that Young watched Smith help Robinson with this task.  (Id.)  She denies that she was sitting on an ink bucket while the rest of the crew set up the machine. (Id. at 64-65.)

12

- On July 16, 2010, Young gave Robinson a verbal warning for not following plant rules. (Def. Exh. 11.) Robinson was given the disciplinary notice because she was part of the crew that did not properly clean their machine's anilox rolls. (Id.) This caused downtime because the next shift's crew lost time cleaning and replacing the wiper blades. (Id.) On the same day, July 16, 2010, Young also gave Morris Gunn, a male employee, a disciplinary notice because he was the Operator for the crew that did not properly clean the machine's anilox rolls. (Def. Exh. 12.)

  Robinson testified that she completed her clean-up task of cleaning out the pain that covers the anilox rolls, and that Young approved of the clean-up.[7] (Robinson Dep. at 66-68.) She testified that the counseling was simply not true. (Id.)

- On July 20, 2010, Young gave Robinson a written warning for not following plant rules. (Def. Exh. 13.) Robinson was given the disciplinary notice because she was part of the crew that did not follow proper procedures in doing the required quality checks. (Id.) As a result, an order that the crew ran was cutting through the flaps causing them to break before folding. (Id.) Young also gave Gunn and Oscar Smith, a male Assistant Operator, disciplinary notices because they were also part of the same crew that did not follow proper procedures in doing required quality checks. (Def. Exh. 14.)

  Robinson's brief did not specifically address this discipline, but only noted that she received the discipline. (Doc. # 41 at 21.)

Robinson testified that routinely during the set-up of the 120 machine, Spencer would call Oscar Smith away from his part of the machine, thus causing Robinson to have to complete the set-up by herself. (Robinson Dep. at 53-56.) This caused

---

[7] Robinson testified that each crew member had his or her own clean-up duties on the 120 machine, and that the crew could not leave until the supervisor approved the clean-up. (Robinson Dep. at 66, 68.)

downtime on the machine.  (Id. at 53, 56.)  Robinson stated that Spencer called a meeting with the employees to address downtime and low production on the 120 machine.  (Id. at 55.)  In this meeting, Robinson alleges that Spencer told the employees and the plant supervisor Ron Murray that she was the cause of the downtime on the 120 machine.  (Id. at 51.)  When Robinson attempted to refute this accusation, Spencer told her to "shut up" and Murray told her not to open her mouth anymore.  (Id. at 56.)  According to Robinson, after the meeting, Oscar Smith told Robinson he was not going to worry about getting production out faster because management was just going to blame her for the low production.  (Pl. Exh. 1. at 10.)

## F.  Robinson's Request for Accommodation

On August 13, 2010, Robinson went to Howard and told him that she needed to work on an automatic machine because working on the manual stacker position on the 120 machine hurt her back due to all the lifting and bending.  (Robinson Decl. ¶ 12.)  She explained that working the manual stacker position hurt her back and affected her more than it did other employees because of her knee problems.  (Id.)  She asked Howard to allow her to work an automatic stacker position on another machine or that he allow her to go back to working the automatic prefeeder position on the 120 machine.  (Id.)  Howard denied Robinson's requests during their meeting that day.  (Id.)

14

**G.  Robinson's In-House Suspension**

On August 26, 2010, one of Robinson's supervisors, Richard Spencer, gave Robinson an in-house suspension for not following plant rules. (Def. Exh. 15.) Spencer gave Plaintiff the disciplinary notice because he assigned a task to Robinson, and not only did she not do it, Robinson allegedly lied to Spencer about doing it. (Id.) Specifically, Spencer directed Robinson to adjust the ink of a machine to its proper levels. (Id.) Upon Spencer's return 30 minutes later, Robinson gave Spencer a certain reading for the ink. (Id.)  However, when Spencer followed up and checked the readings himself, it was different from the information Robinson gave him. (Id.)  In fact, Spencer could not properly check the viscosity of the ink because the cup in the machine was so clogged with dry ink.  (Id.)

Robinson's version of this event is different.  Robinson testified that Spencer did a viscosity ink check on the 120 machine, but he had to borrow an ink cup from another machine because the ink cup on the 120 machine was clogged with ink and could not be used.  (Robinson Dep. at 72-73, 78.)  After doing the check with the borrowed cup, Spencer told Robinson to do another ink check,[8] but he took the borrowed cup with him.  (Id. at 74-76.)  Robinson testified that she tried to do the ink

---

[8]  Robinson contends that she was not responsible for doing daily ink checks.  (Robinson Dep. at 74-76.)

check, but was unable to complete the task without the borrowed cup.  (Id. at 75.)

She claims that Spencer did not give her enough time to get an ink cup from another

machine center before he came back to check on her.  (Id. at 78-80.)  Instead,

Robinson testified that once he returned, Spencer refused to listen to her when she

tried to explain that the cup was clogged, and gave her an in-house suspension for

failing to perform her assigned task and lying to her supervisor.   (Id. at 75-80; Pl.

Exh. 7.)  Robinson believes that Spencer used the situation with the ink check as an

excuse to blame Robinson for something so he could discipline her and move her

through the progressive discipline process to termination.  (Id. at 80.)

## G. Robinson's Termination

On October 13, 2010, after returning from her break, the Operator on the 120

machine, Morris Gun, told Robinson that Spencer wanted to see her in his office.

(Robinson Dep. at 37.)  When Robinson got to Spencer's office, he stated that she had

taken a break without the authorization or approval of the operator.  (Id.; Robinson

Decl. ¶ 15.)  Robinson told Spencer that Paul Davis, an assistant operator on the 120

machine, took her place on the machine so that she could take a break.[9]  (Robinson

Dep. at 37-39.)

---

[9]  Robinson testified that under the plant rules, employees did not have to get permission from the operator to take a break, but are released to go on breaks by replacement employees. (Robinson Dep. at 38-39.)

The next day, On October 14, 2010, Robinson was suspended pending further investigation, for not following plant rules. (Def. Exh. 16.) Specifically, Ron Murray, Plant Superintendent, Gary Williams, a supervisor, and Anthony Allen, a supervisor, gave Robinson this disciplinary notice because she was away from her assigned position for approximately 25 minutes[10] without proper authorization. (Id.) On October 15, 2010, Robinson filed a grievance with the union alleging impartial, unfair treatment and harassment. Robinson testified that male, non-disabled employees, such as Dallas Amos, Paul Davis, and Morris Gun, regularly took extended breaks and were not disciplined. (Robinson Dep. at 49.) She stated that supervisors Spencer and Young were aware of these long breaks because Robinson witnessed Spencer and Young walking with male employees on their way back to the machines from their breaks. (Id. at 42-43.)

After the suspension, Howard consulted with Human Resources Manager Joy Jones, an African-American female, about Robinson's work performance and history of performance-related issues. (Def. Exh. 17.) Howard noted that Robinson had reached the progressive disciplinary step for discharge, and Howard decided to

---

[10] Robinson contends that she actually took at 12-minute break, even though she was allowed 15 minutes. (Robinson Decl. ¶ 15.) She testified that it took her one minute to walk from the break area back to the 120 machine, and that once she got back to the 120 machine she checked her cell phone and that time was 13 minutes past the hour. (Robinson Dep. at 46.)

discharge Robinson for the third, and final, time.  (Def. Exh. 16.)  On October 19, 2010, Ron Murray informed Robinson that she was terminated.  (Howard Dep. at 131.)  After this final discharge, Defendant decided not to give Robinson another last chance agreement.  In addition, Defendant did not replace Robinson with another employee.  (Def. Exh. 17.)

On October 25, 2010, Robinson filed a charge of discrimination with the EEOC related to her termination.  (Def. Exh. 20.)  The charge alleged discrimination because of her race, as well as her gender and disability, as well as retaliation for reporting discriminatory employment practices.  (Id.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's Amended Complaint makes the following claims: (1) that she was discriminated against because of her gender in violation of Title VII (Count I); (2) that she was discriminated against because of her disability in violation of the ADA (Count II); and (3) that she was retaliated against for reporting and opposing discriminated in violation of both Title VII and the ADA (Count III).  (Doc. # 16 ¶¶ 46-58.)  Plaintiff's Amended Complaint clearly states that only acts that occurred with 180 days of October 25, 2010, the date of her EEOC charge, form the basis of her claims.  (Id. ¶¶ 46, 50, 55.)  Therefore, the court considers only those allegations which occurred on or after April 28, 2010.

18

Before the court begins with its analysis of Robinson's claims of discrimination and retaliation under Title VII and the ADA, the court notes that although Defendant's Motion (Doc. # 34) moves for Summary Judgment "as to all claims raised by Plaintiff in her Complaint", (doc. #34), its brief in support of summary judgment only addresses Plaintiff's claim of discrimination and retaliation in her termination.  (See generally Doc. # 35 at 15-41.)  Defendant's brief does not address Plaintiff's claims of discrimination and retaliation in her job assignments (or reassignments as the case may be) or in the disciplines she received.[11]  As the moving party, it is the Defendant's burden to establish that there is "no genuine issue of material fact" as to each claim asserted by Plaintiff.  Anderson, 477 U.S. at 248.  It is not the job of the court to search through the record and make arguments for the parties.

Therefore, because Defendant failed to specifically address these claims of gender and disability discrimination, as well as retaliation, the court will not address them either.  Instead, the court finds that Defendant has effectively not moved for summary judgment on them, and they will remain.  The only remaining claims of

---

[11]  Defendant's brief does discuss Plaintiff's complaints and testimony regarding her job assignments and disciplines within its argument related to her termination.  That discussion, however, is not the same as analyzing those events as separate adverse employment actions under McDonnell Douglas.

discrimination and retaliation to discuss is Robinson's claims of gender and disability discrimination in her termination, and her claim of retaliation in her termination.[12] The court now focuses its attention on those claims.

## A.  General Structure of Analysis

The analysis of Plaintiff's claims will be determined not only by the nature of the allegations but by the quality of the evidence offered in support of those claims. See Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. Id.; see Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon. See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987). Here, plaintiff presented only circumstantial evidence of discrimination.

---

[12]  The court notes that the only adverse employment actions at issue in this action are those that occurred on or before April 28, 2010, or 180 days before Robinson filed her EEOC charge of discrimination and retaliation.  Although Plaintiff discusses some alleged "adverse actions" that occurred before that date, those are not a part of this action.  (See Docs. # 15 & 16.)

"In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Commc'ns., 738 F.2d 1181, 1185 (11th Cir. 1984).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action, but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[13]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); Nix, 738 F.2d

---

[13]   See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

at 1185 (discipline); <u>Pittman v. Hattiesburg Mun. Separate Sch. Dist.</u>, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason[14] for its actions. <u>Rojas</u>, 285 F.3d at 1342; <u>Combs</u>, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." <u>Burdine</u>, 450 U.S. at 254-55; <u>see</u> <u>Chapman</u>, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. Although the prima facie case is irrelevant after the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. <u>See</u> <u>Combs</u>, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate

---

[14] <u>See</u> <u>Chapman</u>, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[15] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting

---

[15]   The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

23

Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## B. Gender Discrimination in Violation of Title VII

Plaintiff alleges that she was discriminated against on the basis of her gender. (Am. Compl. ¶¶ 46-49.) Specifically, she contends that (1) she was treated differently than her male co-workers in job assignments, (id. ¶¶ 34, 47), (2) she was disciplined differently than her male co-workers, (id. ¶¶ 35, 40) and (3) that the reason given for her termination "was a mere pretext for unlawful discrimination based on Plaintiff's gender." (Id. ¶ 40.) Again, as stated above, the court discusses only her claim of gender discrimination in her termination. The other claims remain.

### 1. The Prima Facie Case

In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that she is a qualified member of a protected class, was subjected to an adverse employment action, and other similarly situated employees outside the plaintiff's class were treated more favorably.[16] See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); see also Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ., 342 F.3d 1281, 1289 (11th Cir.

---

[16] See also McDonnell Douglas, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

2003) and <u>Holifield</u>, 115 F.3d at 1562 (11th Cir. 1997).  Here, there is no dispute that Robinson, a female, is a member of a protected class.  Likewise, there is no dispute that Robinson suffered a adverse employment actions in her termination.  Robinson now bears the burden of producing evidence sufficient for a reasonable jury to conclude that she is qualified to perform her job and that a similarly situated male employee was treated more favorably.  <u>Holifield</u>, 115 F.3d at 1562.

### a. Qualified for her Position

Defendant contends that Robinson was not qualified for the position because of her discipline record.  Defendant states that she was counseled on multiple occasions for her poor job performance and for problems she was having doing or understanding her job duties.  The Eleventh Circuit, however, has specifically rejected such an argument that poor performance equates with lack of qualification for a position.  In <u>Damon v. Fleming Supermarkers of Fla., Inc.</u>, the Eleventh Circuit stated that "if a plaintiff has enjoyed a long tenure at a certain position, [the court] can infer that he or she is qualified to hold that particular position." 196 F.3d 1354, 1360 (11th Cir. 1999).  Here, Robinson had been employed with Defendant for well over ten years - since July 1997.  Although Defendant had terminated Robinson on more than one occasion in during her employment history, it also allowed her to return to work under last chance agreements.  Such evidence flies in the face of any argument

25

that Robinson was not qualified for her position as an Assistant Operator on the 120 machine.   As such, Robinson has established this element of her prima facie case.

### b.  The Alleged Comparators

Defendant argues that Robinson has not made out a prima facie case of gender discrimination in her termination under the McDonnell Douglas framework because she has failed to identify a similarly-situated male comparator who was treated differently.   (Doc. #32 at 17-23.)   The McDonnell Douglas framework is not, however, the only way to use circumstantial evidence to survive a motion for summary judgment, and a "plaintiff's failure to produce a comparator does not necessarily doom [her] case." Smith v. Lockheed-Martin, 644 F.3d 1321, 1328 (11th Cir. 2011); see also Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).

If a plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," she "will always survive summary judgment." Lockheed–Martin, 644 F.3d at 1328. And a plaintiff may use "non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination" and thereby create a triable issue. Hamilton, 680 F.3d at 1320; see also Lockheed–Martin, 644 F.3d at 1328; Rioux v. City of Atlanta, 520 F.3d 1269, 1277 (11th Cir. 2008) (holding that circumstantial evidence was sufficient

to establish a prima facie case of race discrimination even though the plaintiff did not present evidence of a comparator); cf. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) ("The methods of presenting a prima facie case are flexible and depend on the particular situation."). Whatever form it takes, if the circumstantial evidence is sufficient to raise "a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." Lockheed–Martin, 644 F.3d at 1328; accord Hamilton, 680 F.3d at 1320. The court, therefore, turns to the issue of pretext and whether Robinson presented sufficient evidence to raise a reasonable inference that Defendant terminated her because of her race.

### 2. Defendant's Articulated Legitimate, Nondiscriminatory Reasons for the Termination and Robinson's Evidence of Pretext

Defendant states that it terminated Plaintiff because in October 2010 she had reached the progressive disciplinary step for termination, and as a result, when she had her final disciplinary action, she was terminated. (Def. Exh. 5.) Defendant reiterates that in the months preceding her termination, Robinson was given a counseling in June 2010, a verbal warning in July 2010, a written warning in July 2010, and an in-house suspension in August 2010, all for poor performance issues. (Id.) This articulation by Defendant satisfies its burden and the burden now shifts to

Robinson to establish that this reason is a pretext for illegal gender discrimination.

Robinson presents two main arguments regarding pretext. She contends that "[t]he discriminatory nature of the discipline [and termination] is evident in (1) the difference in how the supervisors applied the plant rule discipline policy to Robinson compared to the male employees; and (2) Robinson's adamant dispute of the discipline and the start contrast between her account of the incidents underlying the disciplines and that of Defendant." (Doc. # 41 at 45.) One of her arguments regarding pretext fails; the other, however, has more promise. The court discusses the failing argument first and then moves on to her more promising one.

Regarding her second argument, it is at its core an attempt to establish pretext by showing that the stated reason for her termination was false. The court acknowledges that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves, 530 U.S. at 147. Following this line of reasoning, Robinson argues throughout her brief that the reason given for her disciplines which all led to her termination were false. She contends that many of the incidents simply did not occur, and that her supervisor made them up as a reason to discipline and terminate her. Robinson contends that her testimony regarding these incidents establishes pretext. The court disagrees.

This alleged "evidence of pretext" does nothing more than quibble with the

28

reasons given by Defendant for the termination, and such an argument is insufficient to establish pretext.  See Chapman, 229 F.3d at 1030.  Her assertions and argument that she did not do the things alleged by her supervisors do not alone establish that she was terminated because of her sex.  See Wilson v. B/E Aerospace. Inc., 376 F.3d 1079, 1092 (11th Cir. 2004) (holding that plaintiff's self-serving assertions that the articulated reason is not true did not establish that she had been discriminated against).  "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex." Lee, 226 F.3d at 1253.  The role of the court "is to prevent unlawful . . . [employment] practices, not to act as a super personnel department that second-guesses employers' business judgments." Id. at 1254.

Whether the actual facts and events support Defendant's decision is not an issue for this court to referee.  That Robinson disagrees with the decision made by Defendant and cites to facts that support her version of the story leading up to her discharge simply does not satisfy her burden to prove that Defendant did not in good faith believe that it had a legitimate basis for her termination.  See Chapman, 229 F.3d at 1030; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); see also Nix, 738 F.2d at 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason

at all, as long as its action is not for a discriminatory reason."); Abel v. Dubberly, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000); Combs, 106 F.3d at 1543; Alexander, 207 F.3d at 1339, 1341; Damon, 196 F.3d at 1361("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair.") (internal citation omitted)).

All that being said, however, Robinson presented another pretext argument that has much more merit. Robinson has presented evidence that Defendant did not follow the progressive discipline policy when it came to one of her male co-workers, Dallas Amos.[17] (Doc. # 41 at 37-40.) The court is well aware of the requirements of the Eleventh Circuit that "[t]he plaintiff and the employee she identified as a comparator must be similarly situated in all relevant respects." Holifield, 115 F.3d at 1562. This requirements that evidence of comparators be "nearly identical to the plaintiff . . . prevents courts from second-guessing a reasonable decision by the

---

[17] Robinson also points to two other individuals as a potential comparators - Bobby Chapman and Otis Evans - but neither man is similarly situated to Robinson in "all relevant respects" as required by the Eleventh Circuit. Wilson, 376 F.3d at 1091. As to Chapman, he worked in a different department, on a different shift, and had a different supervisor. Additionally, his work-related disciplines were for fighting and other bad behavior, and not for poor performance as a part of the progressive discipline policy. (See Pl. Exh.10; see also Howard Dep. at 43, 150-52.) Evans is a little bit closer of a call, but the evidence presented of his disciplines are not all within a one-year time period and the disciplines discussed by Plaintiff could not have resulted in his termination, even if Defendant had followed its own progressive discipline policy. (See Pl. Exh. 9.)

employer." Wilson, 376 F.3d at 1091.

A thorough review of the evidence presented establishes that Amos is a proper comparator  and that Defendant treated him more favorably than it did Plaintiff. Amos worked in the same position as Robinson as an assistant operator; both worked as assistant operators on the 120 machine and both worked during the second shift. Both Amos and Robinson had the same supervisor(s) during all times relevant to this action.  Amos was disciplined under the progressive discipline policy for violation of plant rules, just like Robinson.  However, Defendant chose to discipline Amos differently, and less harshly, under the policy than it did Plaintiff.

Specifically, Amos's discipline history for violation of plant rules under the progressive discipline policy is as follows:

- January 20, 2010: Amos received a verbal warning for plant rule violation.
- May 24, 2010: Amos received a second verbal warning for a plant rule violation.
- September 28, 2010: Amos received a counseling, instead of a formal discipline, for a plant rule violation.
- November 12, 2010: Amos received a written warning for a plant rule violation.
- January 15, 2011: Amos  received a third verbal warning for a plant rule violation.

(Pl. Exh. 8.)  Under the progressive discipline policy used as the justification for Plaintiff's termination, Amos should have received a written warning for the May

violation, an in-house suspension for the November violation, and should have been terminated for the January violation. Additionally, he could have been terminated even sooner had his supervisor, Spencer, chosen to issue a discipline, as opposed to a mere counseling (which Plaintiff never received during the relevant time frame) in September 2010.

In conclusion, for purposes of summary judgment, Robinson has presented sufficient evidence to raise a reasonable inference that Defendant terminated her because of her gender. Therefore, Defendant's Motion (Doc. #31) for Summary Judgment regarding Plaintiff's claims for discrimination on the basis of gender in her termination is due to be denied for the reasons stated above.

## C. Disability Discrimination in Violation of the ADA

As federal courts have repeatedly recognized, the general purpose of the ADA is to eradicate discrimination against persons with disabilities and to ensure equal treatment. *See* 29 C.F.R. § 1630.1(a) (1999). In the employment context, the ADA was created to provide "qualified" employees protection from discrimination based on their known or perceived disabilities. See 42 U.S.C. § 12112(a) (1991). The Eleventh Circuit has explained that the ADA's sole and express purpose is to provide equal, not preferential, opportunities to disabled persons. Terrell v. USAir, 132 F.3d 621, 627 (11th Cir. 1998). Discrimination under the ADA includes terminating an

individual because of his disability and not providing reasonable accommodations to a disabled employee.

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). In every ADA employment discrimination case, the plaintiff must demonstrate the defendant's discriminatory motive. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977) (noting in the Title VII context that "[p]roof of discriminatory motive is critical, though it can in some situations be inferred from the mere fact of differences in treatment"). When establishing the proscribed motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Defendant contends that Robinson cannot establish any of the elements of her prima facie case of disability discrimination. Specifically, Defendant contends that Robinson "is not legally disabled, she is not a qualified individual, and she was not subjected to unlawful discrimination because of a disability." (Doc. #35 at 29.)   In the alternative, even if Robinson can establish a prima facie case, Defendant argues that "[t]here is no evidence to support that Defendant's legitimate, non-discriminatory

reasons for discharging Plaintiff are a pretext for disability discrimination . . . ." (Id. at 28.)  The court disagrees with Defendant for the following reasons.

"[T]o establish a prima facie case of discrimination under the [Act], [the plaintiff] must demonstrate that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); see also Rossbach v. City of Miami, 371 F.3d 1354, 1356-57 (11th Cir. 2004); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  A person is "disabled" under the ADA in three different ways: (1) if she "has a physical or mental impairment that substantially limits one or more . . . major life activities"; (2) if she has a record of such an impairment; or (3) if she is "regarded as" having such an impairment.  42 U.S.C. § 12102(1).  A "qualified individual" is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "[A] plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." D'Angelo v. ConAgra Foods, 422 F.3d 1220, 1229 (11th Cir. 2005) (internal quotation marks omitted).

An employer unlawfully discriminates against a qualified individual with a

disability when the employer fails to provide "reasonable accommodations" for the disability – unless doing so would impose undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); see also Lucas, 257 F.3d at 1255. "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions." Lucas, 257 F.3d at 1255-56; see also Earl v. Mervyn's, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997). But "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."[18] Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir.1999).

The ADA does not require any and all possible accommodations, and a disabled employee is not necessarily entitled to his first choice of accommodations. Id. at 1285-86. Rather, only "reasonable accommodations" are required by the ADA; an accommodation is not reasonable if it imposes an undue hardship on the employer. See 42 U.S.C. § 12112(b)(5)(A). The plaintiff retains at all times the burden of persuading the jury that reasonable accommodations were available. Moses v.

---

[18] Robinson testified that she asked for an accommodation in August 2010. Specifically, she stated that she asked Howard to allow her to work an automatic stacker position on another machine or that he allow her to go back to working the automatic prefeeder position on the 120 machine. (Robinson Decl. ¶ 12.)

35

American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir.1996).  The employer, on the other hand, has the burden of persuasion on whether an accommodation would impose an undue hardship.  Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1526 (11th Cir. 1997).

### 1.  Robinson is "Disabled" Under the ADA.

The parties spend much time arguing about whether Robinson was disabled under the first definition of disability - i.e. whether she has a physical or mental impairment that substantially limits one or more major life activities.  However, there is clear evidence from Plaintiff (that must be taken as true at the summary judgment stage) that Defendant "regarded" Robinson as disabled.

"Under the 'regarded as' prong, a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception."  Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1216 (11th Cir. 2004) (emphasis added) (citation omitted).  "As with actual impairments, however, the perceived impairment must be one that, if real, would limit substantially a major life activity of the individual."  Id. (emphasis added) (citations omitted).

Robinson testified that after Howard saw her upon her return from surgery[19]

---

[19] Robinson testified that after her surgery and upon her return to work, she remained limited in her ability to walk, bend and lift, and she walked with a noticeable limp.  (Robinson Decl. ¶ 7.)  She wore a knee brace and support stockings for assistance in walking, bending and

and viewed the doctors notes stating that she could return to work without an accommodation, Howard stated "she is not going to be able to work like that." (Robinson Dep. at 15.)   This testimony from Robinson is ample evidence for a reasonable jury to conclude that Howard, her supervisor who made the ultimate decision to terminate her, regarded her as disabled upon her return to work after her surgery.

### 2.  Robinson is a "Qualified Individual" Under the ADA.

As stated above, a "qualified individual" is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Accordingly, an ADA plaintiff "must show either that [s]he can perform the essential functions of h[er] job without accommodation, or, failing that, show that [s]he can perform the essential functions of h[er] job with a reasonable accommodation." D'Angelo v. ConAgra Foods, 422 F.3d 1220, 1229 (11th Cir. 2005) (internal quotation marks omitted).   If the individual "is unable to perform an essential function of h[er] . . . job, even with an accommodation, [s]he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA.  In other words, the

---

standing.  (Id.)

ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." Id. (citation omitted).

Defendant contends that Plaintiff could not perform the essential functions of her job and points to her numerous disciplines for poor job performance. (Doc. # 25 at 33.) Defendant also contends that these disciplines represent many "problems she was having doing or understanding her job duties." (Id.) The court disagrees with Defendant's analysis.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she could perform the essential functions of her job with reasonable accommodations.[20]   Defendant maintains throughout its brief that Robinson's position was that of an assistant operator and remained as such throughout her employment. (See Doc. #25 at 2; Robinson Dep. at 24-25; see also EEOC Intake Questionnaire.) Defendant consistently denies that there is a specific job of prefeeder or stacker; instead, Defendant contends that assistant operators were assigned jobs on a particular machine based on seniority under the CBA.

Regardless of the title of her position, the evidence is sufficient to establish that

---

[20]   The court does not determine whether or not Plaintiff could perform the essential functions of her job without a reasonable accommodation.  The court also does not determine whether working in the manual "stacker" position was an essential function of Robinson's job as an assistant operator.

she could perform the essential functions of the assistant operator job with a reasonable accommodation. The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir.1997); Willis v. Conopco, Inc., 108 F.3d 282, 283 (11th Cir.1997). Here, Robinson identified two possible accommodations - working in the automatic prefeeder position on the 120 machine or working on another, automatic machine in the stacker position. The evidence before the court at the summary judgment stage, taken in the light most favorable to the Plaintiff, is undisputed that she could perform the tasks required for either of these positions.[21] As multiple assistant operators worked on each machine, this accommodation would have been a reasonable one.[22] This is especially true since the 120 machine was the only manual machine at the Birmingham plant. (Robinson Dep. at 24-25.) The

---

[21] Defendant's argument that her multiple disciplines for poor performance somehow make her not able to perform the job's essential functions is rejected by the court for the same reasons stated in Section IV.B.1.a. supra.

[22] The evidence before the court at the summary judgment stage is that Howard simply denied her request for an accommodation without engaging in the interactive process to determine whether the requested accommodation was reasonable. While the court is aware that a disabled employee's right to reasonable accommodation does not equate to a right to the accommodation of her choice, see Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997), the employer has an obligation to engage in an interactive process with the disabled employee to determine whether and which reasonable accommodations are feasible after one has been requested. See 29 C.F.R. § 1630.2(o)(3). This was not done by Defendant.

prefeeder position on the 120 machine was automatic, but the stacker position was manual and required extensive bending and lifting.  (Id.)  All other stacker positions on the other machines at the Birmingham plant were automatic, however, and did not require the bending and lifting like the 120 machine.  (Id.)  Therefore, Robinson presented sufficient evidence from which a jury could find that she was a "qualified individual" under the ADA.

### 3.  Robinson Established that Defendant Discriminated Against Her for Purposes of Summary Judgment by Failing to Provide a Reasonable Accommodation.

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees."  42 U.S.C. § 12112(a); see also Earl v. Mervyns, 207 F.3d 1361, 1365 (11th Cir. 2000).   "[T]he term 'discriminate' includes . . . not making reasonable accommodations to the known physical .  .. limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ."  42 U.S.C. § 12112(b)(5)(A).  Thus, an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," and the employer cannot show undue hardship.   Holly v. Clairson

Industs., LLC, 492 F.3d 1247, 1262 (11th Cir. 2007).  The term "undue hardship" is defined as "significant difficulty or expense incurred by a covered entity."  29 C.F.R. 1690.2(b).

Here, Defendant does not even attempt to argue that the accommodations requested by Robinson would present an undue hardship.  As the court surmised above, there is simply no evidence that allowing Robinson to work on an automatic machine on a stacker position or work on the manual 120 machine on the automatic prefeeder position would present any type of hardship to Defendant.  All the machines in the Birmingham plant were automatic, except for the 120 machine, which in and of itself also had an automatic position that an assistant operator worked.  Robinson was qualified to operate either position, and it would not have been an undue hardship on Defendant to allow her such an accommodation.  Therefore, Robinson has established, at the summary judgment stage, that she was discriminated against on the basis of her disability when she was denied a requested, reasonable accommodation.  As such, summary judgment is inappropriate on Robinson's claim of discrimination on the basis of her disability.[23]

_____

[23]   There is no additional burden on Robinson to show that Defendant enforced its progressive discipline policy in a discriminatory manner by treating non-disabled co-workers differently, nor any subsequent burdens on Defendant to show that it had a legitimate non-discriminatory reason for terminating Robinson or on Robinson to establish that the reasons stated were pretextual. See Holly, 492 F.3d at 1262-63. That being said, even if the court is incorrect in its determination that Robinson was denied a reasonable accommodation, Robinson

## D. Retaliation in Violation of Title VII and the ADA

Title VII and the ADA prohibit an employer from discriminating against any individual for participation in or opposition to practices made unlawful by Title VII or the ADA.  Retaliation claims under Title VII and the ADA are analyzed under the same burden-shifting framework and discussed together here.  Stewart, 117 F.3d at 1287.  To establish a prima facie case of retaliation, Robinson  must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct.  See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir. 1998); see also Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989).  If Robinson is able to advance a prima facie case of retaliation, the burden then shifts in accordance with McDonnell Douglas to Defendant to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts.  See Holifield, 115 F.3d at 1566.  Once her employer articulates such a reason, Robinson must demonstrate that Defendant's proffered explanation is a pretext for retaliation for her claim to survive summary judgment.

---

established pretext in her termination for the same reasons stated above with regard to her gender discrimination claim.  The evidence regarding the progressive discipline of Amos, a non-disabled male employee who is similarly situated to Plaintiff, establishes that Robinson was treated differently than non-disabled co-workers.  See Section IV.B.2, supra.

See id.

Defendant does not dispute that her termination was an adverse employment action.  Defendant also concedes that Robinson engaged in a statutorily protected activity when she filed an EEOC charge for race, gender and disability discrimination, as well as for retaliation.   However, Defendant argues that Robinson failed to establish a prima facie case because her statutorily protected activity is not causally connected to her termination. Specifically, Defendant contends that Plaintiff's engaged in her statutorily protected activity on October 15, 2009, and she was discharged on October 19, 2010.  Defendant argues that the 12 month gap between her protected activity and her termination is not "very close" as required by the Eleventh Circuit to establish the causal connection element of her prima facie case. The court agrees.

To establish a causal connection between the protected activity and an adverse employment action, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."  Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (internal quotations, brackets, and citations omitted).  "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware

of the protected expression." Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1119 (11th Cir. 2001). The causal connection element is "construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (quotation omitted). In some cases, a "[c]lose temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." Bass, 256 F.3d at 1119. The Eleventh Circuit has held "that a plaintiff satisfies [the causality] element if [s]he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir.1999) (retaliation in ADA context).

Here, there is simply no evidence to establish that close temporal proximity between Robinson's October 2009 EEOC charge and her October 2010 termination. When temporal proximity is used to establish a causal connection, the proximity must be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citation omitted). For instance, the Eleventh Circuit has found that "in the absence of any other evidence of causation," a three-month proximity "between a protected activity and an adverse employment

44

action is insufficient to create a jury issue on causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006); see also Davis v. Coca-Cola Bottling Co., 516 F.3d 955 (11th Cir. 2008) (five-month gap between EEOC charge and adverse employment action insufficient to establish causal connection). The 12 month lapse here between her protected activity and ultimate termination is fatal to her claim of retaliation under Title VII and the ADA in her termination.[24]   Therefore, summary judgment is appropriate as to these claims.

## V. Conclusion

In summary, the court finds that no material issues of fact remain as to Plaintiff's claims of retaliation in her termination under Title VII and the ADA, and that Defendant RockTenn CP, LP is entitled to judgment as a matter of law as to those claims. As to all other claims in the Amended Complaint, the court finds that material issues of fact remain, and that summary judgment is not appropriate. A separate order will be entered.

**DONE** this the   11th   day of December, 2013.

_James H. Hancock_
_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[24] The court rejects Robinson's argument that the court should disregard the time period from November 2009 until June 2010 while she was on disability leave because "it was impossible for Defendant to retaliate against her" during her absence.